Ms. Day is here for Mr. Rodriguez. Ms. Bouchard is here for the Secretary. Ms. Day, are you ready to proceed? I am, Your Honor. Good afternoon, members of the Court. My name is Rachel Day, and with me at Council table is Scott Gavin, who has also worked on the briefing of this case. I would like, if I may, to start with a few remarks about the ineffective assistance of Council claim at Mr. Rodriguez's penalty phase. But I want to concentrate on the prejudice prong. The District Court found deficient performance, and I think we will rely on our briefing as to why that deficient performance finding should stand. I would also note that the opposing Council did not file any kind of cross appeal. They were not obliged to. They can rely on the record. We can affirm on any grounds supported by the record. It would be, in fact, improper if they filed a cross appeal in a case where they prevailed. Okay. Well, that being said, I'd still like to... That's our case law. It's pretty clear. Well, that being said, I'd still like to concentrate on the prejudice prong and rely on my briefing for the deficient performance prong. As to the prejudice prong, the District Court found that there was no prejudice because the quote from Sears v. Sutton, it would barely alter the sentencing profile. I would like to take issue with that finding for several reasons, and I can break it down into why I think it was an erroneous finding. The first argument I want to talk about is that the District Court found that because Mr. Rodriguez had aggravating circumstances found, particularly CCP and HAC, she found that the evidence presented in post-conviction would not lessen the weight of those aggravators. That actually is not this court's case law. In several cases, and I'm thinking about Elledge, the court has found that particularly when mental health mitigation is presented, that will, in some cases, lessen the force of the aggravating circumstances. And in this case, we have Mr. Rodriguez who presented evidence of low intelligence of brain damage, which, and the brain damage in turn, increases his impulsivity, his lack of judgment. I thought counsel had him tested for brain damage and it came back normal. No, he did not at all. That's not the record, Your Honor. Counsel had him tested, a preliminary test by Dr. Haber, and he did an initial preliminary test called the Bendigo Stolt. Now, as a result of his testing, he thought there was possible brain damage. And so he recommended that Mr. Rodriguez be evaluated by both a neurologist and a neuropsychologist. He had the evaluation done by a neurologist, which came up normal, but he did not have a neuropsychologist. He had an EEG, right? It was some kind of scan. I can't remember exactly what it was. I believe the record is that it was an EEG and it showed... It was normal. Yeah, it was normal. The thing of it is, is that neuropsychology... How would the counsel have known that he needed to proceed further in the face of that when the expert thought that's all that you needed to look at? Well, Dr. Haber said that he needed to be seen by a neuropsychologist in addition. And the reason for that is neuropsychology is much more subtle than EEGs. I mean, the science at that time, which is 20-something years ago, was not that precise. Did Dr. Haber testify that he thought more needed to be done? He said in his report that more needed to be done, yes. That was before, though, the referral. It was before the referral, but I don't think he talked after that. And nobody ever picked up on the fact that a neuropsychologist... Right, after the fact, though, he never said that anything more needed to be done. No, but he made his recommendation in his report and a neuropsychologist was recommended. And if he'd had a neuropsychologist, like Dr. Latimer, who testified in post-conviction, they would have found the brain damage, the resulting behavioral problems that the brain damage indicates, as well as the very low IQ, which has been held in many, many cases. I'm thinking of Williams versus Taylor amongst many. Low IQ, regardless of whether it's... Was that expert's testimony, though, discredited by the State Collateral Review Court? What it turned into was the state court wanted to have a hearing on whether or not he was mentally retarded, which involves three prongs. That's what it was. It was called mental retardation at the time, which means low IQ, adaptive deficits, and onset before the age of 18. Dr. Latimer used a definition of mental retardation that only used the one prong, and that's why he found the credibility. But her low IQ finding was not discredited. It was not discredited. So are you saying that they credited, the state court credited testimony that he was brain damaged? I think he didn't really... The order was really not very clear. There was certainly nothing to refute it. He... There was no neuropsychologist for the other side testifying. His IQ was unrefuted at that point. But Judge Carney, the state court judge, said, low IQ doesn't mean mental retardation, you lose. Nobody really looked at the fact that low IQ is a very heavy mitigating circumstance, as is brain damage. So that's the aggravating circumstance. Mr. Rodriguez does... I thought Dr. Haber testified again in State Collateral Review. He testified for the state. Yeah, and didn't he testify that Rodriguez did not meet the criteria for any statutory mitigation? He did, in his opinion. However, his original evaluation really wasn't about mitigation. It was just a general... I'm talking about them in State Collateral Review. Yeah, State Collateral Review, he didn't do any more work on the case. He certainly didn't look for mitigation when he did the original report. I thought that's too where he testified that when Dr. David found no evidence of abnormality or disease after the referral because of his concern about brain damage, it was pretty clear that Haber thought that that was sufficient. I don't know why he recommended a neuropsychologist then. His opinion seems to have swayed a little bit between the original trial time and the post-conviction proceeding. But be that as it may, there was evidence of brain damage and low IQ, which I think could have weakened the force of the aggravating circumstances. The district court also had issue because she kind of wanted for the mitigation to... Let me ask you this question. The state habeas court limited the Strickland hearing to the issue of intellectual disability? Yes. How do you get around diligence that, you know, that he didn't object or request that the hearing be expanded to include other evidence of mitigation? We did. He objected? I think we wanted to get people from Cuba. The issue wasn't raised on appeal, though, in State Collateral Review. No. I mean, the investigators... It wasn't exhausted. Right. But as far as, you know, the brain damage is concerned, we did have a hearing on that. Now, as far as the nexus between the mitigation and the criminal conduct is concerned... What about all the other evidence, non-mental health evidence that was not... that came out on post-conviction review? The social history, the poverty, abuse, neglect, childhood stuff. Right. There's a lot of that. Tell us about that. Yeah, there's a great deal about it. I mean, Mr. Rodriguez grew up in Cuba, not Havana, but in a very, very rural, impoverished community. And he was one of many children. His mother drank while she was pregnant with him. He was very, very poor. He did really badly in school. Everybody thought he was crazy. That's the word they said. He would do dangerous things like riding his horse backwards. He would fall. He exhibited a lot of very weird behaviors from early childhood onwards. Why was all of it so powerful that it would have made a difference had this evidence been presented to the jury during the penalty phase? Well, this court has often found that non-statutory mitigation of the social history variety is such a powerful mitigation. I think you can look at the case of Terrell Johnson versus the secretary, where very little. The trial counsel did about as little as Scott Kalish, the trial counsel in this case. And the evidence that was put on at the evidentiary hearing showed a fairly strong social history of poverty, abuse, and neglect. I mean, Judge Kahn likened Mr. Johnson's life to the munch pacing, the scream. So in Terrell Johnson's case, you've got two murders, you've got two homicides, and you've got no mental health mitigation to speak of. So this is even more egregious than the Terrell Johnson case. I mean, the other. Well, the wife did testify. The wife did testify, but she hardly knew him. I mean, she only met him when he was a grown up in Havana waiting to go on the Marielle boat lift. And I mean, her testimony is about, what, 10 pages. It's very, very cursory. She basically said he was a good husband and provider. That's it. So, I mean, he had a lot of people that, you know, Scott Kalish did not go to Cuba. He didn't think he could, but he made no inquiries as to whether he could or not. Anyway. Why couldn't the state habeas court have reasonably concluded that there was a fair amount of aggravating evidence that would have been admitted had they done more and that, therefore, it's... I'm not sure what the court's talking about in terms of more aggravating evidence. Well, had you gone more into his background, his evidence of alcohol abuse, drug abuse, which can be, our case law is clear, a double-edged sword, his previous criminal record, his drug trafficking. Well, it wouldn't come as a statutory aggravation. I mean, the drug trafficking was not violent. But it would certainly be aggravating. It could be a non-statutory aggravation. The concern that Dr. Haber had that he didn't really have anything mitigating to offer, but a fair amount of what he would testify to, in fact, would have been aggravating. Why couldn't the state court, habeas court, have looked at all of this and said, when you consider the total mix here, there's not a reasonable probability. Well, it didn't do that. It didn't really do that kind of analysis. I mean, Mr. Rodriguez did not have an alcohol problem. Certainly, he was involved in... He had a substance abuse problem. That's an issue. But... Of course, but the worst part, it seemed to me, was that a lot of the difficulties with his upbringing ended when he came to the United States, and he had lived here for a decade or more and had a criminal record and was not in any way under the influence of any kind of substance when the crime started. I understand. I would draw the court's attention to the case of Tanard v. Drecke, which doesn't require a nexus between the criminal conduct. Also, look at Porter v. McCollum, because here we had George Porter, who had a horrible childhood. He was quite old at the time of the post-conviction. He was a veteran of the Korean War. He was a war hero. He was a war hero, but he had a lot of bad things, too. He deserted, and there was a lot that was bad, too. And I think the case of Williams v. Taylor, and indeed Wiggins, show that trial counsel did not investigate. He needed to make that decision in an informed fashion, and he didn't do any social history investigation. He just relied, to whatever extent, on Dr. Haber's report. In the closing argument, the prosecutor made some comments that there was no evidence of mental disability, that this was a reasonably intelligent person, that the defense had not put on any evidence, that he had a difficult childhood, anything like that. How does that factor into our prejudice analysis, if it does? Well, the jury never heard any of that. They never heard any mental health evidence. They never heard any social history evidence. The jury, after all, rather than the judge, at that time were the people who recommended the death sentence. They never heard any of it. And the other thing to think about is, part of the jury's recommendation, the judge talks in his order about how the jury said their yeas when they recommend the death sentence very loudly, but Mr. Rodriguez behaved very, very strangely in court. He slept at counsel table. He had outbursts. He looked very disinterested in the proceeding. So I think if the jury had had some context to put that in, they might have been a little bit more sympathetic to him. I mean, that's just a part of it. So there are similar cases that this court and the United States Supreme Court have found prejudice, in fact, similar or less egregious than this one. I would now draw the court's attention to Williams v. Taylor, where the United States Supreme Court talks about low IQ being a powerful mitigating circumstance. Wiggins and Von Piller. If I might use the remainder of my case in chief for the Atkins, unless the court has any further questions about the impact of assistance of trial counsel. As far as the 2255 D1 claim is concerned, I want to make it very clear that the controlling federal law, clearly established federal law that Mr. Rodriguez is relying on, is Atkins v. Virginia. He cited in his initial brief Hall v. Florida and Moore v. Texas, but that was only for the proposition that they were cases in which Florida and Texas respectively had come up with a scheme for looking at mental retardation or intellectual disability in death penalty cases, which ran against the science that's put out by the AIDD and the American Psychological Association. Atkins is very clear that the science is important. You can go through the opinion. The problem with this, it seems to me, with the mental retardation claim, it was really not so much a question of law. It's just a failure of proof. The Florida Supreme Court said that Rodriguez failed to offer valid evidence of his mental retardation. Well, let's, if we may skip to the unreasonable determination of fact, 22D2. The Florida Supreme Court... It's not a determination of fact either. That's just, he didn't put on valid evidence that he was mentally retarded. But the point was that that finding was made in the absence of science. It was made completely... They considered mental health testimony that he had presented at a hearing to address whether he was mentally retarded. Isn't that right? That's true. Mr. Rodriguez also put on, proffered the testimony of experts, nationally recognized experts in the field of mental retardation, Mark Tasse and Dr. Oakland. And they explained how you should conduct an evaluation for mental retardation as it was then in the context of a death penalty. But neither one of them testified that he was mentally retarded. No, but they explained how the science worked so that there was a context for the testimony of Dr. Weinstein who did everything in accordance with prevailing professional standards as opposed to the state psychologist. He administered, though, an IQ test for Mexico. Isn't that right? And normed it to the United States. Yes, and that's entirely appropriate. That's what the science said. There were many learned articles about that. Had Mr. Rodriguez ever lived in Mexico? No. And you have to do this thing. You have to realize that in an ideal world, there would have been a Cuban test with Cuban norms. There isn't. There are four tests in the Spanish language. There's Mexican one, which has problems with the norms. And the prevailing literature is clear that you use the American norms in these contexts. The other three, one is Puerto Rican and considered very bad and never used. One is mainland Castilian Spanish, and the fourth is Argentinian, and that's really not very much used here. So the Mexican norm is what's most widely used in this context of evaluating. Did the state's expert testify that he had used the Spanish? Yes, he did. Yes, and that that was more culturally appropriate for someone who had... Well, he's not a cultural expert. Well, in terms of what kind of IQ test to administer, that that was the more appropriate test for someone from Cuba? That was his opinion. And could not the state court have credited his opinion? And if so, aren't we stuck with it? No, because he came out, you have to remember, he came out with a score on the Spanish, on his Castilian Spanish version, which was very, very consistent with the defense expert score. Within a couple of points, and indeed with all the other scores, the Dr. Lattner score way back 10 years earlier, and a couple of others, they were all highly consistent. But he concluded that he was malingering? He did, because he used inappropriate testing to determine malingering. He used tests which the science says should not be used in the context of a mental retardation evaluation. And that's very, very clear. He didn't do it. As far as the adaptive functioning is concerned, Dr. Weinstein correctly did a longitudinal evaluation. That's what the science says. You do a longitudinal evaluation, you look at everything from the beginning of life to present. He didn't exclude anything in the prison. He just didn't give it a whole lot of weight, because there's not much you can do about ID in a prison, in a highly structured institutional setting like a maximum security prison. There's nothing. So he did it correctly, according to the science. Dr. Suarez did it very incorrectly, and I think we've laid that out in our briefs. So if I may, unless the court has any more questions, I'd like to reserve the remainder of my time for rebuttal. You may. Thank you, counsel. Thank you. We'll hear from the state, Ms. Bichard. Good afternoon. May it please the court, I'm Suzanne Bichard. I represent the Secretary of the Florida Department of Corrections. I will probably throughout this argument refer to the respondent as the state. I apologize for that little misnomer, that's a habit. But you know who I'm talking about. I will address the issues in the order that counsel did. And just briefly, I will largely rely on my briefing to the extent that the court has no questions. There is one factual error that I do want to correct. Counsel, I believe, stated that CCP was found. It was not found. HAC was found, but cold calculated and premeditated was not one of the aggravators. There were three, and it was not one of them. Penis atrocious and cruel, but not. Penis atrocious and cruel, but not CCP. Right. And as for the. Also in the commission of a robbery, what were the other aggravators? The others were prior violent felony, and then there was the commission of a robbery and for pecuniary gain, but those two were merged. So you actually had three aggravating circumstances. Okay. What does the record tell us about what Rodriguez's lawyer did in preparation for the penalty phase of his case? What the record tells us was that after Mr. Rodriguez was convicted, he requested, counsel requested the appointment of a mental health expert and the court appointed Dr. Haber. Dr. Haber examined Mr. Rodriguez. Dr. Haber did not find a reason to do any IQ testing because he didn't, he just didn't find any reason to go further than that. He did recommend neuropsychology testing based on the fact that Mr. Rodriguez had claimed to have fallen from a horse as a child and lost consciousness. He didn't really do anything with the Haber report, did he? Well, he had the Haber report and... I thought he told the judge, Judge, I'm not prepared for the penalty phase. I haven't done anything at all in preparation for the penalty phase. He admitted that he had not at that point. Now, what we have to, what this court needs... Then there was a delay in the penalty phase. There was, and the penalty phase took place in March and the conviction was in January. So you had a few months there to... Other than the Haber report, what does the record tell us what he did was he asked for the appointment of the neurologist and the neurologist examined the defendant and found that there was no evidence of brain damage. An EEG was done and it was normal. So what he did was he asked for, you know, those two experts to be appointed. They were appointed. He had their information to review. He also had access to this defendant and the defendant, he testified in post-conviction. The defendant was not very helpful. The defendant didn't want his family involved and he felt hampered by that and felt like his defendant was not cooperative. And he also erroneously believed that he couldn't go to Cuba. Okay, there's that. But he did have his, the reports. He also had the, he made a motion in limine in the trial court. What do you mean when you say he had the reports? He had the reports of Dr. Haber and the report of the... Dr. David. So he had those that, prior to the penalty phase, he had those that he could consider in deciding what strategy to pursue here. In Dr. Haber's report, what did he say about the need for examination by a neuropsychologist? Was there anything more than just a line that that should be done? I don't recall that there was anything more than I recommend that he be examined further because he had reported these incidents from the past in which he had lost consciousness. Was there any indication that there was no need for an examination by a neuropsychologist? I'm not sure that I can answer that. I mean, I... I thought Dr. Haber testified in State Collateral Review that that was sufficient. He did. And he said, I essentially recommended this because of what I was told by this defendant. So he had that to go on. And he's in an abundance of caution. Let's go ahead and get a neurologist in here to examine him. I hope I've answered your question. Yes. Okay. He missed a lot of stuff. He wasn't aware of the history of abuse by his family when he was a child or the bullying by his peers. We find out later that he had low IQ or organic brain damage dysfunction. Raised in a house with a dirt floor, no running water, no toilet, no electricity. They teased him because he was slow, called him a dummy. I mean, there's a lot of stuff he missed. A lot of information came out, but that information would not have moved the dial in this case. And the state court was correct in finding that. Let's break it down a little bit. So there was mental health mitigation presented on State Collateral Review. There was. But there was not any competent evidence of other mitigation about his childhood, etc. Presented at State Collateral Review. Isn't that right? That's correct. Investigative summaries were admitted for a limited purpose to show what his mental expert had considered. But she said she had that available to her and did not consider it. But there was no independent, as I understand it, other non-mental health mitigation presented in State Collateral Review. That's correct. There were only the summaries. They were not deemed admissible. He failed to prove what else his lawyer could have found other than mental health mitigation. Correct. Didn't the Florida Supreme Court, though, treat that as evidence? No, Your Honor. The district court did. The district court considered. Florida Supreme Court refers to it as evidence. Well, I suppose you could say that they did. I know that the district court was very clear about saying I'm going to go ahead and consider this for the truth of the matter asserted. So... Well, the limited purpose that the state habeas trial court had admitted it for, he did not challenge or appeal. That's correct. That evidentiary ruling. That's correct, Your Honor. So the state, the respondent, would request that this court find that he's not entitled to relief on that issue. As far as the second issue is concerned, yes, the case that matters here is Atkins. And... And I would just like to... I know that the court had a couple of questions for the petitioner. What we had here was a situation where you had essentially the battle of experts. And you had mental health experts come in for the defense and mental health experts come in for the state. And the court, the state court, considered all of that and made its determination. And... Petitioner claims that this was, you know, not in accordance with the medical standards. But the state disagrees with that. And the state court found, you know, that the state had presented evidence in post-conviction that Mr. Rodriguez didn't have any reliable... They considered the three prongs, basically. That the... There was no reliable indication or testing that showed he had below, you know, a 70 or below IQ. And the reason for that was that the state court credited Dr. Suarez who testified that, look, there was evidence of malingering. And also the fact that the... the test that was given to him by Dr. Weinstein was not an appropriate test. And so the state court credited that... What was the evidence about that? So... To the extent that the state habeas... That the state court discredited the evidence as a Mexican language test normed to the United States, that's problematic. What's the evidence that would have told the state court that that was improper? The evidence was... Or unreliable? The evidence was Dr. Suarez's testimony. What did he say? He said that you have to... That he administered the Spanish version because... that was normed in Spain because the cultural similarities between Spain and Cuba... Cuba and Mexico are not culturally similar and also the problems with the Mexican test. And so that is what he testified. What's the problem with the Mexican test? The problem with the Mexican test, as I recall, was that the Mexican test had been found to favor people with a higher education level. And... So that skewed the results for everybody and made the test... As I understood it, was there a problem in that given educational levels and other socioeconomic kind of conditions in Mexico to take a Mexican test and then norm it to the United States where there are different kinds of educational levels and socioeconomic conditions that that's inappropriate? Yes. And as I understand it, the testimony was that not only that that's inappropriate, that you have to have a culturally similar norming, but also that with regard to that specific test, because it was geared or favored... I'm not... probably not using the correct psychological terms, but it favored people of a higher education level that it skewed the results such that a person taking that test, if they had a lower level of education, would have a lower score than a person with a higher level of education. That is as I understand it, but that was part of the testimony there. So I hope that that answered your question. I feel like I've gone into a rabbit hole. Well, the record will show what it does. I just want... I just wanted as much help about that record as I could get. Okay. So the bottom line is there was evidence of all... So he had a full hearing in the State Court. The State Court made a reasonable determination. That's the benchmark. It was reasonable based on the facts, and it was a reasonable application of Atkins. Atkins is the clearly established federal law that matters here. If there are no further questions, the respondent would ask that you affirm. Thank you. Thank you, Ms. Bouchard. Ms. Day, you've reserved some time for rebuttal. I did, Your Honor. And I guess just to focus your time with the time that you have left, what I'm primarily concerned about is not the Atkins claim, but the Strickland claim? Yes, Your Honor. I will address that. Okay. And so the District Court found deficient performance on the Strickland claim, right? Yes, Your Honor. But no prejudice. Yes, Your Honor. Why was the District Court wrong on that? It was wrong for several reasons. Number one, it said that there was no deterrent from Sears v. Upton. It would barely alter the sentencing profile. And I think there's many reasons why it would alter the sentencing profile. Number one, because of the mental health mitigation, the brain damage, and the low IQ, regardless or not whether his mental retardation claim is right. He had a low IQ and it was unrebutted at that time. I apologize in the case in chief. I completely am getting old. I forgot that it was not CCP, but I do apologize. I was not intending to mislead the court. But I do believe that the mental health evidence would have reduced the impact of the aggravating circumstances that the district court was concerned about. The childhood was distant, but I think there was something for an expert to look at. She decided not to consider it in reaching her opinion. She? Yes, the expert. Right. But it was treated as evidence by the Florida Supreme Court, and it was certainly treated as evidence by the district court. So I think we have that. I don't well, as I understand it, the district court pointed out that Rodriguez had the opportunity to prove all the issues about difficult childhood didn't do that in state habeas, and in so far as the Florida Supreme     the district court did not support the mental health mitigation issue. Can you point me anywhere in the opinion where it was considering it as evidence of anything else? I've read that opinion. I don't see it. It does support the mental health as well. And you have to look at mitigation as parts of a whole rather than family and social history and mental health on the other side. It's all part of the same bundle of things, all designed to humanize the mental health issue. The trial counsel did not begin to look at this until after the guilt phase was over, even though he knew there was overwhelming evidence of guilt. He did nothing to investigate any kind of mitigation whatsoever. He admitted at the evidentiary hearing and post-conviction that he had no knowledge of mental health issues. He had no knowledge of the DSM. He didn't understand it. So what was his penalty phase strategy? Was it to humanize? Or was it residual doubt? It was residual doubt. Did he say what his strategy was? He said after the fact that he wanted to put the life on for just about 10 pages. That's it. You also have to look at the fact that... All he did after consulting mental health experts and getting a report that offered him no mitigating evidence and in fact some potentially aggravating evidence and after getting a report that suggested to him and to his expert no brain damage. No. I don't think that's a fair way of putting it at all, Your Honor. Remember that the Dr. Noble David report was only done after the jury recommended the death penalty. The Dr. Haber report did recommend a neuropsychologist. It recommended a complete neurological and neuropsychological investigation. That means complete. What he got was not a complete neurological and neuropsychological investigation. That was never done. The other thing I'd like to address that the State brought up was that Mr. Rodriguez did not want allegedly, according to the State, and I'm using that word too, I understand. Wait a minute. Dr. David did his work during the penalty phase, not during post-conviction. No, that's right, in the penalty phase. It was not until... So that was something that counsel considered. I think it was done after the jury sentencing and before the actual sentencing. The other thing I want to bring to the attention of the court, although trial counsel requested a continuance of the penalty phase and got one, the real reason he did it was not to prepare for this penalty phase. It was to go and attend a completely unrelated case in federal court in Puerto Rico. So he wasn't even working during the continuance. So that's another thing. I mean, the lack of preparation is woeful. I'd like to touch on the assertion that Mr. Rodriguez was not cooperative. Trial counsel said during his post-conviction testimony that Mr. Rodriguez was passive and not interested. But this is not one of those cases in which the defendant actively forbids counsel from working. In fact, Dr. Haber in his report mentions that Mr. Rodriguez was quite cooperative. So I think the suggestion that Mr. Rodriguez somehow didn't want this has to go bad in the totality of the record. So, Your Honor, if the Court has no further questions, I should rest. I see no questions. Thank you, counsel. Thank you, Your Honor. The Court is in recess until 9 o'clock tomorrow morning. All rise.